**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**THE STATE OF NEW YORK, NEW YORK STATE**
**DEPARTMENT OF EDUCATION, NEW YORK**
**STATE OFFICE OF GENERAL SERVICES,**
**NEW YORK STATE DEPARTMENT**
**OF ENVIRONMENTAL CONSERVATION,**

|  |  |
|---|---|
| **Plaintiffs,** | |
| -against- | **03-CV-1410** |

**FRENCH CREEK MARINA, LLC, WILBERT C.**
**WAHL, JR, HEINZ WAHL, NORTHEAST**
**AQUANAUTS, LOUIS SCHREINER,**
**Individually and as Officers and/or Directors,**

**Defendants.**
_____

**FRENCH CREEK MARINA, LLC,**

|  |  |
|---|---|
| **Plaintiff,** | |
| vs. | **03-CV-1449** |

**ONE 20th CENTURY TROTMAN ANCHOR,**
**in rem,**

**Defendant.**
_____

| APPEARANCES: | OF COUNSEL: |
|---|---|
| HON. ELIOT SPITZER<br>Attorney General of the<br>State of New York<br>*For N.Y. State parties* | Lisa M. Burianek, Esq.<br>Asst. Atty. Gen. |
| LAW FIRM OF PETER E. HESS<br>3 Mill Road<br>Suite 303<br>Wilmington, Delaware 19806<br>*For Defendants in 03-CV-1410*<br>*and Plaintiff in 03-CV-1449* | Peter E. Hess, Esq. |

1

**THOMAS J. McAVOY,**
**Senior United States District Judge**

## MEMORANDUM, DECISION & ORDER

### I.   INTRODUCTION

In the mid-nineteenth century, after watching a sloop drag for lost anchors off the shore of

Cape Cod, Henry David Thoreau  wrote:

> It is a singular employment, at which men are regularly hired and paid for their
> industry, to hunt to-day in pleasant weather for anchors which have been lost,—the
> sunken faith and hope of mariners, to which they trusted in vain; now, perchance,... if
> the roadsteads of the spiritual ocean could be thus dragged, what rusty flukes of hope
> deceived and parted chain cables of faith might again be windlassed aboard! enough
> to sink the finder's craft, or stock new navies to the end of time. The bottom of the
> sea is strewn with anchors, some deeper and some shallower, and alternately covered
> and uncovered by the sand, perchance with a small length of iron cable still
> attached,—to which where is the other end? So many unconcluded tales to be
> continued another time.

*The Writings of Henry David Thoreau*, vol. 4, pp. 162-163, Houghton Mifflin (1906).

Like the anchors the mariners searched for in Thoreau's day, the instant cases arise from the

discovery, and removal, of a lost anchor from its underwater resting place.  These cases represent a

continuation of the tale of this lost anchor, but not its conclusion.

### II.  BACKGROUND

On September 22 and 23,  2002, a large anchor ("the Anchor") was discovered and removed

from the bottom of the St. Lawrence River near Clayton, New York.  The first case arising from this

discovery and removal , State of New York v. French Creek Marina, LLC, 03-CV-1410, is a civil

enforcement action commenced in New York State Supreme Court, Jefferson County, by the State

of New York and various State agencies.  This action, alleging violations of state law by defendants,

2

seeks: (1) a declaration that the Anchor belongs to the State of New York; (2) an injunction preventing the defendants from engaging in similar salvage operations in the St. Lawrence River; (3) an order transferring physical custody of the Anchor to the State; and (4) an award of restitution and/or damages for any loss that may have been caused by the removal of the Anchor from the riverbed.  The action was removed to this Court on November 21, 2003.

The second case, French Creek Marina LLC v. One 20th Century Trotman Anchor, 03-CV-1449, is an *in rem* action brought under the Court's admiralty and maritime jurisdiction by the French Creek Marina LLC ("French Creek" or "the Marina") against the Anchor. This action was commenced on December 4, 2003 and the Marina seeks a declaration that it is the rightful owner of the Anchor under the law of finds, or, in the alternative, that it be awarded "a liberal salvage award ... pursuant to the law of salvage."  The State of New York has made a limited appearance in this action asserting its ownership of the Anchor, but asserts that it has not waived its Eleventh Amendment immunity to suit in federal court.

The Anchor was arrested in the *in rem* action and is in the legal custody of this Court. See docs. # 13 & # 14 in 03-CV-1449. A hearing was held on February 23, 2004 to determine whether French Creek should serve as the temporary substitute custodian of the Anchor.  At the request of the attorneys, and because the two actions involve common questions of law and fact, the actions were consolidated. See Feb. 23, 2004 Trans. p. 6.  After hearing evidence from the parties, the Court determined that French Creek Marina could serve as the temporary substitute custodian for the Anchor during the pendency of these actions. See May 12, 2005 Order, dkt. # 20 in 03-CV-1449. Presently before the Court is the State of New York's motion seeking summary judgment in its favor, and/or dismissal or remand of the actions.

3

The following facts are derived either from the State's unopposed Local Rule 7.1 Statement of Material Facts, see Local Rule 7.1(a)(3); see also Gubitosi v. Kapica, 154 F.3d 30, 31 n. 1 (2d Cir. 1998)(per curiam), or are derived from the evidence presented by the parties at the February 23, 2004 hearing and viewed in the light most favorable to the non-movant. See Abramson v. Pataki, 278 F.3d 93, 101 (2d Cir. 2002).

On September 22, 2002, Defendant Heinz Wahl, operator of the dive charter vessel *Fast Rescue One* (and a partner with his father, Wilbert C. Wahl, Jr., of French Creek Marina, LLC ) attempted to locate the wreck of the schooner *Maggie L* for a dive with a group from Northeast Aquanauts scheduled for the following day.  Heinz was accompanied by Louis Schreiner from Northeast Aquanauts who was going to video tape the dive.  In attempting to locate the *Maggie L*, Heinz Wahl observed what appeared to be the fluke of an anchor in the bed of the St. Lawrence River near Clayton in approximately 60 feet of water about 1,000 feet from the *Maggie L*. Upon further investigation, Wahl discovered a large anchor partially buried[1] in the river bottom sediments and described "muck." State's 7.1 Stat. ¶¶ 15, 16, 17, 18, 19, 23, 24.  There is no dispute that the Anchor was located on submerged land belonging to the State of New York. See The Submerged Lands Act, 43 U.S.C. §§ 1301, 1311, 1312.[2]  As will be discussed below, there is a dispute whether

---

[1] The State's Local Rule 7.1 Statement  uses the term "embedded" to describe the Anchor.  Because this term has specific legal connotations, the Court has substituted similar factual terms such as "partially buried."

[2] The Submerged Lands Act establishes that title to and ownership of the lands beneath navigable waters, and the natural resources within such lands and waters within the boundaries of the respective States, is vested in the States. 43 U.S.C.§ 1311. "Lands beneath navigable waters" means, *inter alia*, "all lands permanently or periodically covered by tidal waters up to but not above the line of mean high tide and seaward to a line three geographical miles distant from the coast line of each such State." 43 U.S.C. § 1301(a)(2). " The term 'coast line' means the line of ordinary low water along that portion of the coast which is in direct contact with the open sea and the line marking the seaward limit of inland waters." 43 U.S.C. § 1301(c); see also 43 U.S.C. § 1312("The seaward boundary of each original coastal State is approved and confirmed as a line three geographical miles distant from its coast line or, in the case of the Great Lakes, to the international boundary.").

the Anchor was embedded in this land, at least as that term is defined by applicable law.

Heinz Wahl, Louis Schreiner and others spent more than four hours "rigging and digging the anchor to pull [sic] from the muck," attached several air filled 55-gallon drums to the Anchor to raise it from the underwater lands, and attempted to tow it to shore. State 7.1 Stat. ¶ 17.  However, while attempting to transport it to shore, the Anchor became hung up (again, the State uses the word "embedded") on an underwater shoal. Defendants left the Anchor there and returned the next day, September 23, 2002, and conducted additional "rigging" and removed the anchor from the shoal and towed it to the French Creek Marina in Clayton, New York. State's 7.1 Stat. ¶¶ 17, 18, 19. The Anchor was removed from the water, cleaned with a pressure washer, and placed for display in the French Creek Marina's parking lot. State's 7.1 Stat. ¶¶ 24, 25.

Sometime thereafter, the State learned of the recovery of the Anchor because both French Creek and Northeast Aquanauts posted pictures and statements about its recovery on their Internet websites.[3]  The State sent letters to the Wahls and Schreiner contending that removal of the Anchor was in violation of New York law because they had failed to seek written permission from the New York State Education Department or the New York State Department of General Services to appropriate, excavate or "recover" the Anchor as required by New York Education Law §§ 233(4) and (5), and never obtained a "Section 233 permit" from either agency. State's 7.1 Stat. ¶¶ 27, 28.[4]

---

[3] As of July 18, 2005,  pictures of the Anchor were available at French Creek Marina's Internet website, http://frenchcreekmarina.com, and story about the recovery of the Anchor, and pictures of it, were available at Northeast Aquanauts' Internet website, http://www.northeastaquanauts.com/Recovery%20.htm.

[4] Section 233(4) of the Education Law prohibits disturbance or removal of objects of  historic interest located on state lands. As is pertinent to this case,  Section 233(4) provides:

> [N]o person shall appropriate, excavate, injure or destroy any object of archaeological and
> paleontological interest, situated on or under lands owned by the state of New York, without the

(continued...)

Further, the State advised that the removal of the Anchor was illegal because no party had obtained

a "stream disturbance permit" under New York Environmental Conservation Law ("ECL") §15-

0501. State's 7.1 Stat. ¶¶ 29, 30.[5]  At the February 2004 hearing, Wilbert Wahl contended that he

did not believe he needed a Section 233 permit because he had been told earlier that he did not need

such a permit to remove sunken logs from the bottom of the St. Lawrence, and because he saw no

difference in removing what he believed to be a discarded anchor. See Feb. 23, 2004 Trans. pp. 58-

64. Heinz Wahl contended that the necessity of a stream disturbance permit would be an absurd

application of law in these circumstances because, by logical extension, it would require every

boater to apply for such a permit before dropping anchor in the waters of New York.  Therefore, he

did not believe one was required to remove the Anchor. See id. p. 83-84.  There is no dispute,

however, that a permit to remove the Anchor was neither applied for nor granted.

Also at the February 2004 hearing, the Marina presented a videotape that depicted the

Anchor shortly before, and to the point of, its removal from the bottom. See Ex. 5. The contents of

---

[4](...continued)
written permission of the commissioner of education. A violation of this provision shall constitute a
misdemeanor. The discovery of such objects shall be forthwith reported to the commissioner by the
state department or agency having jurisdiction over such lands.

Section 233(5) authorizes state agencies with jurisdiction over the state lands in question to issue permits for the
"examination, excavation or gathering of archaeological and paleontological objects upon the lands under their
respective jurisdictions . . . with a view to the preservation of any such objects worthy of permanent preservation and, in
all cases, to the acquisition and dissemination of knowledge relating thereto." Education Law § 233(5).

[5] ECL § 15-0501(1) prohibits any "person or corporation" from acting to "change, modify or disturb the
course, channel or bed of any stream . . . or remove any sand gravel or other material from the bed or band of the such a
stream without a permit issued pursuant to subdivision 3 of this section." A person or entity wishing to conduct activities
that could modify or disturb the bed of a stream must apply for a permit from the Department of Environmental
Conservation ("DEC"). ECL §15-0501(3). ECL § 15-0501(3) requires the DEC to review the application to determine
the probable effect of the proposed project or work on the health, safety, welfare and natural resources of the State and
its citizens. ECL § 71-1127 authorizes the DEC, by the Attorney General, to enforce violations of ECL §15-0501 by
civil action, with the violator of that section liable for a civil penalty of not more than five hundred dollars ($500) for
such violation, and an additional civil penalty of not more than one hundred dollars ($100) for each day during which
such violation continues, as well an injunctive relief.

6

the videotape are discussed more fully below.  Heinz Wahl also presented a historical overview of the sinking of the *Maggie L*. <u>See</u> Feb. 23, 2004 Trans. pp. 88-98.  This overview, based upon what appears to have been extensive research and investigation by Wahl, indicates that the *Maggie L,* built in 1892, was a 67-foot schooner with a beam of 17 feet, four inches and was used primarily to carry coal. <u>Id.</u> pp. 92-93. On her final voyage, the *Maggie L* left Bath, Ontario on October 31, 1929 bound for Clayton, New York to receive a shipment of coal. <u>Id.</u>  Around 7:00 in the evening, outside of Clayton and while still in the shipping lane, <u>id.</u> p. 80-81, the *Maggie L* was struck by the *Keystate*, a ship "250 feet in length, 42-foot 6-inch and [weighing] over a thousand net tons." <u>Id.</u> p. 92.  The *Maggie L* was struck approximately 14 feet from her bow. <u>Id.</u> p. 95.  The force of the collision sheered off the bow of the *Maggie L,* causing her to sink. <u>Id.</u>  After she sank, her masts were lit to warn other ships of the hazzard, and later the masts were "blown off" by the Army Corp. of Engineers because they presented a hazzard to navigation. <u>Id.</u> p. 93.  "[S]alvage by owner and state was forgone." <u>Id.</u>

The Anchor, which has a shank of eleven feet, is estimated at weighing between 2,500 pounds and 4,500 pounds. <u>See</u> Wahl Aff. ¶ 9; Peckham Aff. ¶ 12; Reith Dec. 29, 2004 Aff. ¶ 34. Based upon the relative sizes of the Anchor and the *Maggie L*, Wahl concluded that the Anchor could not have come from the *Maggie L* - "it would be like putting a thousand pound anchor on a ten foot boat.  It would have a very difficult time floating."  <u>Id.</u> p. 98.  Wahl further concluded that based upon the location of the Anchor on the riverbed and its proximity to the *Maggie L* wreck; the direction of travel of the two ships when they collided; the location of the debris field from the collision; and historical knowledge of the *Keystate*, the Anchor did not come from the *Keystate*

either. Id. pp. 87, 96-98. Instead, Wahl speculates that the Anchor, which is a Trotman anchor,[6] is a "rouge anchor" lost off the deck of a merchant ship traversing the St. Lawrence. Id. pp. 78, 100-01. Wahl bases his conclusion that the Anchor was lost over the side of a ship, as opposed to be being cut free after becoming stuck in the bottom, on his contention that the lower shank of the Anchor had not gained purchase in the bottom (as evidenced by the fact that the upper shank was standing proud of the bottom). See fn. 6, *supra.*

The State now moves for summary judgment contending that it is entitled to the following findings by the Court:

> 1) The Abandoned Shipwrecks Act, 43 U.S.C. § 2101, *et seq.* ("ASA"), applies to and governs the claim by French Creek Marina and the State to the Anchor, not admiralty law;

> 2) The State has demonstrated a colorable claim to the Anchor;

> 3) The admiralty action, French Creek Marina LLC v. One 20th Century Trotman Anchor, 03-CV-1449, should be dismissed because the Court is without jurisdiction as it is an action against the State and violates the Eleventh Amendment;

> 4) French Creek Marina's salvage claim, pleaded in the alternative in its Verified Complaint in rem, is a monetary claim against the State of New York, and is barred by the Eleventh Amendment;

> 5) The removed state court action, State of New York v. French Creek Marina, LLC, 03-CV-1410, although consolidated with the admiralty action, contains no federal claims, was improvidently removed, and should be remanded to New York.

On April 11, 2005, the parties appeared and argued in support of and in opposition to the

---

[6] A Trotman anchor is designed with flukes connected to the shank by a pivoting pin, thereby allowing the flukes to pivot. Wahl Aff., ¶ 5. The design was intended to protect deep draft ships in relatively shallow waters from being holed by the upper fluke of an anchor "standing proud of the bottom" (*i.e.* pointing upward from the bottom). Id. When a ship anchors using a Trotman anchor, the lower fluke "gains purchase in the bottom" (*i.e* engages in the bottom) and the tension on the shaft causes the upper fluke to pivot so that it lies flat against the shank and does not present a hazard. Id. A picture of a Trotman anchor, c. 1850s, is available on the Internet at: http://www.scienceandsociety.co.uk/results.asp?image=10449884&wwwflag=2&imagepos=1.

summary judgment motion.  At the parties' request, the Court allowed additional affidavits addressed to application of the Abandoned Shipwreck Act.  The Marina  submitted the affidavit of Heinz Wahl in which he describes the design of a Trotman anchor, <u>see</u> fn. 6, *supra*, and further describes the location, position, and recovery of the Anchor. <u>See generally</u> Wahl Aff.  In this regard, he asserts that other than the use of his (and other diver's) hands, the only other devices used in the recovery of the Anchor were the rigging lines and the 55-gallon drums used "for buoyancy, *not* for excavation." <u>Id.</u> 10 (emphasis in original).  Hence, Wahl asserts that no "tools of excavation" were used to recover the Anchor. <u>Id.</u>  In reaching this final conclusion, Wahl notes that the 55-gallons drums are not "air lifts" within the meaning of the United States Department of Interior's "Abandoned Shipwreck Act Guidelines, December 4, 1990," 55 Fed. Reg. 50116, 50121 ("ASA Guidelines"),[7] which lists certain "tools of excavation."

The State submitted the affidavit of Arthur Cohn, co-founder and Executive Director of the Lake Champlain Maritime Museum in Vergennes, Vermont.  Cohn agrees with Wahl's description of the Trotman-designed anchor, <u>see</u> Cohn Aff. ¶ 8, and agrees that 55-gallon drums are not "air lifts" as referenced in the ASA Guidelines. <u>Id.</u> ¶ 18. He disagrees, however, with Wahl's conclusion that "tools of excavation" were not used in the recovery of the Anchor. <u>Id.</u> ¶¶ 16-23. Cohn notes that the ASA Guidelines provides a non-exhaustive list of tools of excavation, <u>see</u>  55 Fed. Reg. at 50121 ("tools of excavation would include, but not be limited to, ...."), and provides in the preamble that

> [t]ools of excavation are tools used to remove or displace bottom sediments or

---

[7] Section 5 of the ASA mandates that the Secretary of the Interior establish guidelines within nine months after enactment of the ASA to "assist states * * * in developing legislation and regulations to carry out their responsibilities under this Act."  43 U.S.C. § 2104(c). These Guidelines are a result of that mandate.

coralline formations to gain access to embedded shipwrecks. Examples have been provided; they clearly indicate that diving equipment normally worn by recreational divers while exploring or viewing shipwreck sites are not considered to be tools of excavation.

55 Fed. Reg. at 50117. Cohn opines that because divers do not wear straps and air filled barrels when exploring or viewing shipwreck sites, they are tools of excavation if they are used to displace bottom sediments to gain access to items in the river bottom. Id. ¶ 17. He further concludes that because the videotape shows that there are no zebra/quagga mussels on the shank, it was "embedded in the river bottom sediments when initially found." Id. ¶ 13. He also opines that the weight and mass of the Anchor would have caused the Anchor to embed in the bottom even if only dropped (but not deployed), id. ¶ 20, and that the use of the straps and several 55-gallon drums served the purpose of breaking the Anchor free from its embedded state and, thus, were "tools of excavation" used in its recovery. Id. ¶ 23.

## III. DISCUSSION

### A. Subject Matter Jurisdiction

As a threshold matter, the Court must address the challenge to its subject matter jurisdiction. California v. Deep Sea Research, Inc., 523 U.S. 491, 501-02 (1998); Florida Dept. of State v. Treasure Salvors, Inc., 458 U.S. 670, 684 (1982); see United States ex rel Kreindler & Kreindler v. United Technologies Corp., 985 F.2d 1148, 1155-56 (2d Cir. 1993)(motions challenging subject matter jurisdiction must be adjudicated first), cert. denied, 508 U.S. 973 (1993). As the Verified Complaint in the removed action indicates, the State's claim to title of the Anchor is based, at least in part, upon ASA. See Verified Complaint, at ¶¶ 24-25. As the arguments by the parties make clear, the primary dispute in this case concerns the application of the ASA and its effect on the State's

10

Eleventh Amendment immunity.

The ASA does three things pertinent to this case. First, it establishes *federal* ownership of certain abandoned wrecked vessels and associated artifacts within a state's territorial limits, or within three miles from shore on state underwater lands. See 43 U.S.C. § 2105(a).  Second, it transfers that ownership to the state where the items are found. See 43 U.S.C. § 2105(c).  And third, it provides that "[t]he law of salvage and the law of finds shall not apply to abandoned shipwrecks to which [the Act] applies." 43 U.S.C. § 2106(a). Consequently, if the ASA applies to the Anchor, title is transferred to the State, the Court is divested of jurisdiction over the maritime action, and the civil action must be remanded to state court because this Court would have no further basis for subject matter jurisdiction over the Anchor or claims related thereto. See Fathom Exploration, LLC v. The Unidentified Shipwrecked Vessel or Vessels, 352 F. Supp.3d 1218, 1225 (S.D. Ala. 2005). Nevertheless, despite the State's assertion of Eleventh Amendment immunity, the Court retains jurisdiction to determine whether or not the ASA applies. See Deep Sea Research, 523 U.S. at  507-08.[8]

**B.  Application of the ASA**

A review of case law, treatises, and law review articles reveals that the application of the ASA is far from clear.[9]  Various courts, relying upon the Supreme Court's decision in Treasure

---

[8] The State concedes this point in its Reply Memo of Law , stating: "It is apparent from California v. Deep Sea Research, Inc., 523 U.S. 491, 118 S.Ct. 1461 (1998) that this Court has jurisdiction to determine whether the ASA § 2105 applies in this case, notwithstanding the State's assertion of sovereign immunity. However, the State respectfully submits that the Court may lack jurisdiction to adjudicate title of putative State property in admiralty because the State has not waived its sovereign immunity." Reply Mem L., p. 7.

[9] See generally Iraola, R., *The Abandoned Shipwreck Act of 1987,* 24 Whittier Law Review 787 (Summer 2004); Note: *Shipwrecks Lost and Found at Sea: The Abandoned Shipwreck Act of 1987 Is Still Causing Confusion and Conflict Rather Than Preserving Historic Shipwrecks,* 8 Widener L. Symp. J. 301 (2002); Comment: *The Abandoned*

(continued...)

Salvors, have held that a state need only assert a "colorable" claim to a wreck to invoke the ASA.

See Zych v. Wrecked Vessel Believed to be the Lady Elgin, 960 F.2d 665 (7th Cir. 1992); Deep Sea

Research, Inc. v. The Brother Jonathan, 883 F. Supp. 1343, 1349 (N.D. Cal. 1995), aff'd, 102 F.3d

379, aff'd in part, vac. in part, 523 U.S. 491 (1998); Fairport Intern. Exploration, Inc. v.

Shipwrecked Vessel, Captain Lawrence, 913 F. Supp. 552, 554 (W.D. Mich. 1995), aff'd  105 F.3d

1078 (6th Cir. 1997), vacated and remanded, 523 U.S. 1091 (1998). However, there has been no

clear definition of what constitutes a "colorable claim" under the ASA, nor what standard of proof

applies to making this determination. See Deep Sea Research, Inc., 523 U.S. at 500-01;[10]  Jones,

J.P., *The United States Supreme Court and Treasure Salvage: Issues Remaining After Brother

Jonathan,* 30 J. Mar. L. & Com. 205, 220 (April 1999)(Noting that after Deep Sea Research, one of

the important questions remaining was: "When is a claim of title sufficiently colorable for a state

out of possession?"); Note: *California v. Deep Sea Research: Leashing in the Eleventh Amendment

to Keep Sinking Shipwreck Claims Afloat,* 27 Pepp. L. Rev. 657, 677-78 (2000);[11]  see also  163

---

[9](...continued)

*Shipwreck Act of 1987: Navigating Through the Fog*, 35 Gonz. L. Rev. 75 (1999/2000); see also Foster, S., *Validity, Construction, and Application of Abandoned Shipwreck Act of 1987*, 163 A.L.R. Fed. 421 (Westlaw 2005); Trueman v. The Historic Steamtug New York, 120 F. Supp. 2d 228, 234 (N.D.N.Y. 2000)(Kahn, J.).

[10]  In Deep Sea Research, Inc. , the Supreme Court  noted that in asserting a claim under the ASA, some circuits have required "that a State only need only make a bare assertion to ownership of a *res*" to invoke the ASA. 523 U.S. at 500-01 (citing Zych, 960 F.2d at 670; Maritime Underwater Surveys, Inc. v. The Unidentified, Wrecked and Abandoned Sailing Vessel, 717 F.2d 6, 8 (1st Cir. 1983)).  However, the Circuit Court in Deep Sea Research applied the preponderance of the evidence standard, and the Supreme Court did not resolve the question of what standard applied in determining whether a state had a "colorable claim" under the ASA.

[11]  The author of this Note concludes:

After [Deep Sea Research], the Court, at minimum, left open three very important issues. The first is the issue of what is abandonment? * * *  The second ... is to what degree must a claim be colorable for a state to be able to invoke Eleventh Amendment immunity? Although the Court's holding makes this question moot for an *in rem* proceeding where the state has no possessory claims, the Court's failure to

(continued...)

A.L.R. Fed. 421, at § 6.

Here, there is no dispute that the submerged land on which the Anchor was found belongs to the State. Given the lack of opposition to the State's Local Rule 7.1 Statement, it is also deemed admitted that the Anchor is more than 50 years old and, based upon its age, is an object of "archeological interest" to the State of New York. See State's 7.1 Stat. at ¶¶ 21-22. Accepting these facts, it follows that the State has an interest in possessing and controlling the Anchor. See N.Y. Navig. L. § 2(33), § 2(34);[12] § 130 *et seq.*,[13] N.Y. Educ. L. § 233; N.Y. Public Lands Law § 3, § 75; see also 43 U.S.C. § 2101(a).[14] Thus, at first blush and except for questions related to whether the Anchor was embedded in State land, or located on State land included in or determined eligible for inclusion in the National Register, the State would seem to have a colorable claim to the Anchor under the ASA.

---

[11](...continued)
be clear on this issue will cause continued confusion as to the degree of colorability a state must prove when the state makes at least some claim of possession. The most the Court was willing to say on this issue was that the district and appellate courts who decided the case had applied an awkwardly high standard.

27 Pepp. L. Rev. at 677-78.

[12] N.Y. Navigation Law § 2(33) provides that

"Abandoned historic shipwreck" shall mean wrecks situated on or under lands owned by the state, in which the state holds title pursuant to the Abandoned Shipwrecks Act of 1987 ... or which, by reason of their antiquity, history, architecture, archaeology or cultural value, have state or national importance and are eligible for inclusion on the state register of historic places, and which have been abandoned by the owner of record. The term shall include the wreck, its cargo and contents and the situs.

Section 2(34) defines the term "wreck" to mean "any wrecked property, other than an abandoned historic shipwreck."

[13] Article Ten of New York's Navigation Law "deals with recovery and salvage of only those wrecks which are not abandoned historic shipwrecks." N.Y. Navig. L. § 130-a.

[14] The ASA was enacted to given application to Congress' desire to give the states "the responsibility for management of a broad range of living and nonliving resources in State waters and submerged lands."

However, the ASA applies only to "shipwrecks," <u>see</u> <u>generally</u> 43 U.S.C. § 2101 *et seq.,* and only certain historically significant shipwrecks at that. <u>See</u> <u>Zych v. Wrecked Vessel Believed to be</u> *<u>The Seabird</u>,* 941 F.2d 525, 529 (7th Cir. 1991).[15]  The ASA defines the term "shipwreck" to mean "a vessel or wreck, its cargo, and other contents." 43 U.S.C. § 2101(d).  The ASA Guidelines provide:

> Shipwreck as defined in the Act means a vessel or wreck, its cargo, and other contents.   The vessel or wreck may be intact or broken into pieces scattered on or embedded in the submerged lands or in coralline formations.   A vessel or wreck includes, but is not limited to, its hull, apparel, armaments, cargo, and other contents.  <u>Isolated artifacts and materials not in association with a wrecked vessel, whether intact or broken and scattered or embedded, do not fit the definition of a shipwreck.</u>

55 Fed. Reg. at 50121 (emphasis added).

The un-refuted evidence before the Court indicates that the Anchor is not associated with a shipwreck.  As indicated above, the Marina's evidence is that the Anchor is not from the *Maggie L* or the ship that sunk her.  The State has had the opportunity to examine the Anchor, <u>see</u> Reith Dec. 29, 2004 Aff.¶¶ 33-34, and has learned of the approximate location where the Anchor was found and its geographic relation to the *Maggie L* wreck. <u>See</u> Bauder Dec. 29, 2004 Aff. ¶ 9.  Yet, despite this information, which seemingly gives the State a sufficient basis to mount a challenge to the Marina's contention that the Anchor did not come from the *Maggie L* or the *Keystate*, the State simply contends that because the Anchor was removed from the St. Lawrence River (thereby depriving the State of the opportunity to assess its historical significance in the context of the surroundings in which it was found), it "cannot say with any certainty that the anchor is or is not ... associated with a shipwreck." Reith Dec. 29, 2004 Aff.¶ 35.

---

[15] In <u>Zych</u>, the Seventh Circuit noted that in enacting the ASA, "Congress only cared to transfer ownership and ensure protection of shipwrecks of 'historic significance,' which it estimated to be a mere five to ten percent of the 50,000 abandoned shipwrecks located in the navigable waters of the U.S."  941 F.2d at 529 (citation omitted).

The State argues that the Marina should not be "rewarded" for its improper conduct of removing the Anchor before allowing the State the opportunity to assess its significance and, perhaps, association with the *Maggie L*.  Nonetheless, the State does nothing to challenge the Marina's contentions that because of the Anchor's size and design, it could not have been carried by the *Maggie L* or the *Keystate*.  These are propositions that could conceivably be addressed without viewing the Anchor in the underwater location in which it was found.  Certainly, the law prohibits a party from benefitting from its own wrongdoing, and if there was *some* indication that the Anchor was associated with the *Maggie L*, then the Court would be inclined to draw that inference in the State's favor. But there is no evidence in the present record indicating that the Anchor is associated with the *Maggie L*.

Inasmuch as the proverbial bell cannot be un-rung (that is, the Anchor cannot be put back into the exact circumstances and conditions in which was found), the Court must conclude that the State will never be able to challenge the Marina's contention that the Anchor is unrelated to *Maggie L*, or establish that it is related to any shipwreck.  This conclusion sounds the death knell of the ASA in this case. Absent any evidence that the Anchor is associated with a shipwreck, the Court cannot conclude that the State has asserted a colorable claim under the ASA no matter what standard is applied.

Accordingly, the Court finds that the ASA does not apply to the Anchor.  Inasmuch as removal of State of New York v. French Creek Marina, LLC, 03-CV-1410, was based upon the purported presence a federal question by the invocation of the ASA, see Notice of Removal, ¶ 4, that case must be remanded to New York state court.

**C.  The Eleventh Amendment**

This determination, however, does not end the inquiry.  The Marina has brought an *in rem* admiralty action against the Anchor seeking, *inter alia*, title to the Anchor. The State has asserted that it is the rightful owner of the Anchor, and has asserted that the Eleventh Amendment bars adjudication of the *in rem* action in federal court.

The Supreme Court held in <u>Deep Sea Research</u> that the "Eleventh Amendment does not bar the jurisdiction of a federal court over an *in rem* admiralty action where the res is not within the State's possession." <u>Deep Sea Research</u>, 523 U.S. at 494-95. In reaching this conclusion, the Court distinguished the <u>Deep Sea Research</u> case from <u>Treasure Salvors</u> on the grounds that in <u>Treasure Salvors</u>, the State had gained physical possession of the res, whereas in <u>Deep Sea Research</u>, the State made "no claim of <u>actual</u> possession of the res." <u>Id.</u> at 506 (emphasis added). Throughout the <u>Deep Sea Research</u> decision, the Court repeated the requirement of actual possession of the subject res in order to avoid Eleventh Amendment application. <u>See id.</u> at 506 ("Although the Eleventh Amendment bars federal jurisdiction over general title disputes relating to state property interests, it does not necessarily follow that it applies to *in rem* admiralty actions, or that in such actions, federal courts may not exercise jurisdiction over property that the State does not <u>actually</u> possess.")(emphasis added); <u>id.</u> at 506-07.[16]

---

[16] In this regard, the Court wrote:

In considering whether the Eleventh Amendment applies where the State asserts a claim in admiralty to a res not in its possession, this Court's decisions in cases involving the sovereign immunity of the Federal Government in *in rem* admiralty actions provide guidance, for this Court has recognized a correlation between sovereign immunity principles applicable to States and the Federal Government. ... In one such case, <u>The Davis</u>, 10 Wall. 15, 19 L.Ed. 875 (1869), the Court explained that "proceedings *in rem* to enforce a lien against property of the United States are only forbidden in cases where, in order to sustain the proceeding, the possession of the United States must be invaded under

(continued...)

16

Here, although the State might have a claim of *constructive* possession to the Anchor because it was located on State property and because the State has asserted ownership and control of all artifacts of historical value on its property, it is undisputed that the State never had actual possession of the Anchor. Indeed, the State was not even aware of the Anchor's existence until it was brought up and referenced on the Internet websites of French Creek  Marina and Northeast Aquanauts. Accordingly, the Eleventh Amendment does not bar adjudication of the *in rem* admiralty action - at least that much of the claim seeking title to the Anchor under the law of finds (discussed *infra*).

### D.  Merits of the Admiralty Action

While French Creek Marina asserts its admiralty claims under both the law of finds (seeking title to the Anchor) and the law of salvage (seeking that it be granted a salvage award), it presses its claim on the law of finds, asserting its right to title of the Anchor. See Marina's Mem. L. in Opp. S. J., pp. 6-8; see also McLaughlin, S., *Roots, Relics and Recovery: What Went Wrong with the Abandoned Shipwreck Act of 1987,* 19 Colum.-VLA J.L. & Arts 149*,* 160 (Spring/Summer 1995);[17]

---

[16](...continued)
process of the court." Id., 77 U.S. at 20.   The possession referred to was "an actual possession, and not that mere constructive possession which is very often implied by reason of ownership under circumstances favorable to such implication." Id., at 21.

523 U.S. at 506-07 (emphasis added, citations omitted).

[17] The author of this article stated as follows:

Maritime law distinguishes the finder of abandoned property from the salvager, or salvor, of the property of another. The law of salvage is held to apply to circumstances in which the owner of a maritime property is known. The law of finds prevails when the property appears to have been intentionally deserted. Much turns on the distinction. A salvor who acts of her own volition to rescue property from marine peril is entitled to healthy compensation. However, a finder who reduces property to possession is entitled to outright ownership.

(continued...)

Schoenbaum, T., 2 Admiralty & Mar. Law § 16-7 (4th ed.)(Westlaw 2005).[18]  Although the law of

salvage may be favored as a course of first resort, see 2 Admiralty & Mar. Law § 16-7 ,[19] there is

ample reason to pursue the law of finds claim in the first instance.

The parties are in agreement that the Anchor is an abandoned item of some antiquity, see

State's 7.1 Stat. at ¶¶ 21-22, and both proceed on the proposition that title can be adjudicated under

the law of finds.  Further, the Anchor was recovered almost three years ago and arrested well over a

year ago, yet there has been no appearance by any party asserting original ownership of the Anchor.

Although the Court has one reservation regarding the issue of abandonment (addressed below), "in

cases where (1) articles have been presumptively abandoned, i.e., either affirmatively renounced, or

---

[17](...continued)
19 Colum.-VLA J.L. & Arts at 160 (citations omitted).

[18] As explained in 2 Admiralty & Mar. Law § 16-7:

Sharp theoretical differences exist between the law of salvage and the law of "finds," although which one is applicable to a particular case may present some difficulty. The clear major premise of the law of salvage is that the property that is the object of the salvage act is owned by persons other than the salvor. The purpose and rules of the laws of salvage are designed to accord the salvor a right to compensation, not title. This is the case even with respect to "derelict" property, which the law of salvage defines as property on navigable waters which is abandoned and deserted by those who were in charge of it. The salvor of derelict property does not acquire title (unless no owner comes forward); he can claim only an increased award and cannot be charged as an interloper or trespasser.  The term "abandonment" in salvage law means that the owner has lost the power to prevent salvage. The salvor has only superior right to possession, not title, until a court has passed on title and the salvage award.

The law of finds is operative in admiralty as an adjunct to the law of salvage, with the same jurisdictional basis. The assumption of the law of finds is that title to the property may have been lost; this normally requires strong proof, such as the owner's express declaration abandoning title. ... The primary concern of the law of finds is title to the property. The finder can acquire title against all the world (except an owner who shows non-abandonment) by demonstrating the intent to acquire the property and possession (or a high degree of control).

[19] ("Nevertheless, admiralty favors the law of salvage, not finds, because salvage law's purposes, assumptions, and rules, directed toward the protection and preservation of maritime property, are more consonant with societal needs and interests.  Thus, the law of salvage applies as a general rule. The law of finds applies only in two categories of cases: (1) where the owners have expressly and publicly abandoned their property;  and (2) where items are recovered from an ancient shipwreck and no one comes forward to claim them.").

so long lost that time can be presumed to have eroded any realistic claim of original title, and (2)

those articles are now in hand, having been actually recovered, the better-reasoned authorities agree

that the law of finds may appropriately be utilized." Martha's Vineyard Scuba Headquarters, Inc. v.

Unidentified, Wrecked & Abandoned Steam Vessel, 833 F.2d 1059, 1065 (1st Cir. 1987)(citations

omitted). The Court finds that the facts of this case indicting that the Anchor was lost many years

ago sufficiently support the conclusion that the Anchor has been abandoned such to allow the claim

under the law of finds to proceed. See 2 Admiralty & Mar. Law § 16-7.[20]

The law of finds arises from the common law concept of *animus revertendi* (the owner has

no intention of returning), and, while it has been applied to cases involving ancient shipwrecks, see

Martha's Vineyard Scuba Headquarters, 833 F.2d at 1065; Klein v. Unidentified, Wrecked &

Abandoned Sailing Vessel, 758 F.2d 1511, 1513-14 (11th Cir. 1985); Columbus-American

Discovery Group, Inc. v. Unidentified, Wrecked & Abandoned Sailing Vessel, 742 F. Supp. 1322,

1336 (E.D. Va. 1990); Jupiter Wreck, Inc. v. Unidentified, Wrecked & Abandoned Sailing Vessel,

691 F. Supp. 1377, 1385-90 (S.D. Fla. 1988); Chance v. Certain Artifacts Found and Salvaged, 606

F. Supp. 801, 804-805 (S.D. Ga.1984), aff'd, 775 F.2d 302 (11th Cir. 1985), it has also been applied

to individual items under the common law doctrine separate and part from admiralty law. See e.g.

United States v. Shivers, 96 F.3d 120 (5th Cir. 1996)(applying the "federal common law of finds" to

metal tokens found in an abandoned lumber mill town located in the Angelina National Forest);

Note: *Being and Embeddedness: The Abandoned Shipwreck Act's Historical Proxy is All at Sea,* 34

---

[20] ("In the treasure salvage cases, often involving wrecks hundreds of years old, the inference of abandonment
may arise from lapse of time and non-use of the property, or there may even be an express disclaimer of ownership.
This calls for the application of the law of finds. ... In virtually all of the treasure salvage cases involving wrecks of great
antiquity, the law of finds, not salvage, is appropriate because '[d]isposition of a wrecked vessel whose very location has
been lost for centuries as though its owner were still in existence stretches a fiction to absurd lengths.'")(quoting
Treasure Salvors, Inc. v. Unidentified, Wrecked and Abandoned Sailing Vessel, 569 F.2d 330, 337 (5th Cir. 1978).

Georgia Law Review 1743, 1751-53 (Summer 2000)(examining cases under the common law of finds addressed to such objects as "an ancient ... Indian canoe;" a fifteen inch, twenty pound fragment of the statue of King George III that was toppled by a band of patriots on July 9, 1776; and "a sixty-pound, silicon-based meteorite.")(citations omitted).  Also known as the "ancient and honorable principle of 'finders keepers,'" the law of finds is based on the principal that title to lost property will be granted to the first finder to reduce such property to his or her possession. 34 Georgia Law Review at p. 1749 (citing, *inter alia*, Martha's Vineyard Scuba Headquarters, 833 F.2d at 1065).

> The common law of finds generally assigns ownership of the abandoned property without regard to where the property is found.   Two exceptions to the rule are recognized:  First, when the abandoned property is embedded in the soil, it belongs to the owner of the soil;  Second, when the owner of the land where the property is found (whether on or embedded in the soil) has constructive possession of the property such that the property is not 'lost,' it belongs to the owner of the land.

Klein, 758 F.2d at 1514; see 34 Georgia Law Review at 1750.  The State argues that if the law of finds applies, the "embeddedness exception" applies to the Anchor. See State Mem. L. p. 14-15.

Inasmuch as: (1) it is a factual question to be decided by the Court whether an object is embedded under both the law of finds and the ASA, see Zych, 941 F. 2d at 530 n. 7;[21]  Deep Sea Research, 883 F. Supp. at 1354-56; (2) the embeddedness exception to the ASA was modeled on the

_____

[21] At footnote 7, the Seventh Circuit stated in Zych that

[a]s used in the context of the law of finds, embeddedness is a factual question to be established by evidence.  See Chance v. Certain Artifacts Found & Salvaged from The Nashville, 606 F. Supp. 801, 807 (S.D. Ga. 1984)(court finds "vessel is firmly attached to river bottom" after hearing evidence from expert diver), affirmed without opinion, 775 F.2d 302 (11th Cir. 1985);  Klein v. Unidentified, Wrecked & Abandoned Sailing Vessel, 568 F. Supp. 1562, 1566 (S.D. Fla. 1983)(court finds vessel embedded after hearing uncontradicted testimony and viewing film indicating wreck is substantially buried in land), affirmed, 758 F.2d 1511 (11th Cir. 1985).

941 F. 2d at 530 n. 7.

embeddedness exception to the law of finds, see Zych, 941 F. 2d at 530 n. 7 ("'Embeddedness' in the ASA is to be 'consistent with the recognized exception from the law of finds for shipwrecks embedded in submerged lands of a state.'")(quoting  H.R.Rep. No. 100-514(I), 100th Cong., 2d Sess., reprinted in 1988 U.S. Code Cong. & Admin. News 365, 375-376); and, (3) all parties have asserted that the evidence presented to the Court to date supports their respective positions relative to the question of embeddedness under the ASA, the Court finds a sufficient factual and legal basis to determine, on the present record, whether the Anchor was embedded in State underwater property.

In embarking on the embeddedness analysis, it is important to remember that the matter comes before the Court on a motion for summary judgment. The Marina did not submit a Statement of Material Facts in opposition to the State's Statement of Uncontested Facts and, therefore (as indicated above), all of the properly supported facts in its Rule 7.1 Statement are deemed admitted for purposes of the motion.[22]  The State's 7.1 Statement asserts, at paragraph 23, that "[p]rior to its removal, the abandoned anchor was embedded in sediments and/or mud on the underwater lands in [the] St. Lawrence River owned by [the] State of New York."  As discussed below, the word "embedded" has its own legal implications. Before addressing these legal implications, the Court looks at the plain meaning of the word.

According to the Oxford English Dictionary, the word "embed" means "to fix firmly in a surrounding mass of some solid material."  By not opposing the State's Local Rule 7.1 Statement, it

---

[22] This does not mean, however, that all of the assertions in the State's Local Rule 7.1 Statement are deemed admitted. Local Rule 7.1(a)(3) is concerned with resolving *factual* disputes, not legal disputes. Much of what is asserted in the State's 7.1 Statement is legal in nature. See e.g., State's 7.1 Stat. at ¶¶ 1-8.  Legal conclusions asserted in a Local Rule 7.1 Statement will not be deemed "admitted," especially in a case, such as this, where the non-movant has submitted an opposing Memorandum of Law. However, there are number of factual contentions that are deemed admitted for purposes of this motion.

is deemed an established fact that the Anchor was fixed firmly in the surrounding mass of solid material on the bottom of the St. Lawrence prior to its removal.

Further, the record supports the conclusion that the Anchor was embedded. The videotape admitted into evidence at the February 2004 hearing depicts the Anchor partially buried on its side on the bottom of the St. Lawrence River with one of its flukes pointing toward the surface. The Anchor' other fluke, even if folded against the Anchor's shank, was completely buried in the riverbed. There also can be little dispute that the sheer mass of the Anchor, even when falling in the water, caused the Anchor to embed itself, at least partially, into the riverbed. See Cohn Aff. ¶ 20 ("Regardless of whether the anchor was specifically deployed or not by its original owner, the anchor's embedded state is clearly evident in the videotape. When the anchor fell into the river bottom, its weight and mass clearly created an embedded state."). As Wahl contends, when he came upon the Anchor, it was buried to the point that one in ten in divers would not have recognized it as an Anchor. Id. p. 76.[23]  Because the Anchor was lying on its side, the conclusion must be reached that one-half of its mass (one fluke and at least one-half of the shaft) was buried in the bottom sediments.

> Under the "embeddedness exception" to the law of finds, the property need not be totally buried to satisfy the embeddedness requirement. What is affixed to the land belongs to the owner of the land ... [W]here a portion of a find is firmly affixed to the land, then even though other portions of it lie in loose surface soil, title to the entire

---

[23]  At the February 23, 2004 hearing, Wahl testified only that, when he came upon the Anchor, "one in ten divers wouldn't have recognized it as being an anchor." He does not explain what about the Anchor would have disguised it from being identified. However, in a statement attributed to Wahl on the Northeast Aquanauts website in which he defends the recovery of the Anchor, he asserts "The anchor was buried to a point where 9 out of 10 divers would have difficulty recognizing it as an anchor." http://www.northeastaquanauts.com/Recovery%20.htm (emphasis added). Given the other evidence presented in this case and the State's repeated assertion that Wahl admitted the Anchor was partially buried when he found it, it is clear that Wahl was referring to the way the Anchor was positioned on, and partially buried in, the riverbed when he found it that would have disguised it from being identified as an anchor by other divers .

find nevertheless rests with the land owner.

Jupiter Wreck, 691 F. Supp. at 1386 (quoting Chance, 606 F. Supp. at 806-07).

While Heinz Wahl testified that he used his hands to "gain access" to the Anchor, the evidence also establishes, without contradiction, that he and others spent four hours "rigging and digging the anchor to pull it" from the substance that formed the bottom of the River.   Further, the uncontradicted evidence establishes that Wahl needed at least six air filled 55-gallon drums attached to the Anchor by straps to lift it out of the bottom sediment and bring it ashore. While the videotape does not show the point at which the Anchor actually broke free from the bottom sediment, it does show the point immediately before this occurred. This clearly demonstrates the bottom sediment being disturbed in a cloud so thick that it virtually obscured the Anchor and the divers from view. Given the other un-refuted evidence in this case, this clearly and convincingly demonstrates that the air filled barrels were used to break the Anchor free from its embedded state.  Like the partially buried Indian canoe in Allred v. Biegal, 219 S.W. 2d 665, 666 (Kan. City Ct. of App. 1949), this feat could only have been accomplished with the use of tools intended to free the object from the ground.  When it was found, the Anchor "was not a movable thing on the earth. It was in the earth, and in a very significant sense immovable; that is, it was only movable as  parts of the earth are made movable by the hand of man." Goddard v. Winchell, 52 N. W. 1124, 1126 (Iowa 1892).

The Court concludes that the Anchor was embedded on State owned submerged land, and thus the embeddedness exception to the law of finds applies.  Still further, even assuming, *arguendo,* that the Anchor was not embedded, the State had constructive possession of Anchor by virtue of State law granting to the State the authority to control and manage its underwater resources, including artifacts of archeological significance. See N.Y. Educ. L. § 233; N.Y. Public

Lands Law § 3, § 75; N.Y. Navig. L. § 2(33). Thus, the second recognized exception to the law of finds also applies in this case.

The one reservation the Court has in entering judgment in favor of the State granting it exclusive title to the Anchor stems from the fact that under both federal admiralty law and New York state law, there are requirements that public notice be published before adjudicating title to items recovered from the water. <u>See</u> Suppl. R. for Certain Admiralty & Mar. Claims, Rule C(4);[24] N.D.N.Y. L. R. Proc. for Admiralty & Mar. Cases, Rule C(c)(2) (defining the required contents of such publication); N.Y. Navig. L. § 139 (requiring published notice by the County Sheriff). Here, no evidence has been presented that any public notice, other than the posting of the Arrest Warrant on the Anchor, has been accomplished.  While the parties may agree that the Anchor has been abandoned by its original owner, given what appears to be lack of proper notice, the Court is only prepared to say that the State has a superior claim to title to the Anchor over that of the Marina. In light of the arguments raised by the State that the Anchor is not being properly protected from the elements while in the Marina's custody, and given the clear indication that, if the Anchor is truly abandoned, the State will be granted exclusive title to it, the Court vacates its Order appointing the Marina as the temporary substitute custodian of the Anchor, and appoints the State of New York as the proper custodian of the Anchor. The State is instructed to contact the United States Marshal for the Northern District to arrange for the proper paperwork and undertaking so that the State of New York can be appointed as the temporary substitute custodian of the Anchor.  The State shall then file proper orders with this Court, which will be signed and entered accordingly. Upon doing so, the

---

[24] As stated in the Comment to Suppl. Rule C(4), "[i]f no claimant appears to cause release of the arrested property then, after 10 days, the plaintiff is obliged to cause notice to be published."

State may take the Anchor into its physical custody, and, upon doing that, the holding of <u>Deep Sea Research</u> will no longer apply and, under the holding of <u>Treasure Salvos</u>, the Eleventh Amendment will prohibit further adjudication of any claims to the Anchor in this Court. Once the State has acquired actual custody of the Anchor, it shall submit a proposed Order dismissing the Marina's admiralty action without prejudice to whatever further proceedings might be necessary in state court.

### III. CONCLUSION

Based upon the above, it is hereby

**ORDERED** that the action entitled <u>State of New York v. French Creek Marina, LLC</u>, 03-CV-1410, is REMANDED to the New York State Supreme Court, Jefferson County; and it is further

**ORDERED** that upon presentation of proof that the State of New York has taken the steps necessary to serve as substitute custodian of the res in <u>French Creek Marina LLC v. One 20th Century Trotman Anchor</u>, 03-CV-1449, the May 12, 2004 Order appointing French Creek Marina substitute custodian of the subject anchor, doc. # 20, shall be VACATED, and the State of New York shall be APPOINTED as the substitute custodian of the Anchor; and it is further

**ORDERED** that upon presentation of proof that the res in <u>French Creek Marina LLC v. One 20th  Century Trotman Anchor</u>, 03-CV-1449, has been transferred into the actual possession of the State of New York, the *in rem* action entitled <u>French Creek Marina LLC v. One 20th  Century Trotman Anchor</u>, 03-CV-1449, shall be DISMISSED WITHOUT PREJUDICE TO FURTHER ACTION IN NEW YORK STATE COURT, at which time the warrant of arrest shall be VACATED and the Anchor RELEASED from the jurisdiction of this Court.

**IT IS SO ORDERED.**

DATED:   July 20, 2005

Thomas J. McAvoy
Senior, U.S. District Judge

26